2024 IL App (1st) 190566-U-B

SIXTH DIVISION
June 28, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF

ILLINOIS FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 20601 |
| | ) | |
| ELBERT GASTON, | ) | Honorable |
| | ) | Angela Munari Petrone, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE TAILOR delivered the judgment of the court.
Presiding Justice Oden Johnson and Presiding Justice Mitchell concurred in the judgment.

**ORDER**

¶ 1    *Held:* Cause remanded for second stage postconviction proceedings where the circuit court dismissed petitioner's postconviction petition without considering his supporting affidavits and where postconviction counsel failed to comply with Supreme Court Rule 651(c).

¶ 2    The circuit court dismissed Elbert Gaston's petition for postconviction relief under the

Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)) at the second stage.

We affirmed this ruling in *People v. Gaston*, 2021 IL App (1st) 190566-U. Gaston then petitioned

the supreme court for leave to appeal. On September 27, 2023, the supreme court denied leave to appeal, but issued a supervisory order directing us to vacate our judgment and consider the effect of *People v. Addison*, 2023 IL 127119, on the issue of whether Gaston received reasonable assistance of postconviction counsel and determine if a different result is warranted. *People v. Gaston*, No. 128192 (Ill. Sept. 27, 2023). Accordingly, we vacated our judgment in *Gaston*, 2021 IL App (1st) 190566-U, in a separate order.

¶ 3    After our supreme court's supervisory order in this case, we ordered supplemental briefing for the parties to address the effect of *Addison* on the facts of this case.  After considering the original arguments of the parties, as well as the supplemental briefs filed, we find that *Addison* requires a different result.  For the following reasons, we reverse and remand for second stage proceedings consistent with this order.

¶ 4                                    BACKGROUND

¶ 5    Gaston was charged, in pertinent part, with attempted aggravated criminal sexual assault of R.C., based on an incident that occurred during the late evening hours of September 30, 2011, and into the early morning hours of October 1, 2011.  The record shows that, prior to trial, on April 2, 2012, the State informed the court that  the parties "are trying to see if we can work this out. If not, on the next court date I'll be filing a motion for proof of other crimes." Over three months later, the State indicated, "there was a preliminary offer tendered and for the record, it is now revoked."

¶ 6    Following a bench trial in 2012, Gaston was convicted of attempted aggravated criminal sexual assault and sentenced, as a Class X offender, to 15 years' imprisonment. The relevant evidence adduced at trial is summarized here.

¶ 6    R.C. testified that Gaston was  the  biological  father  of  three  of  her  four children, and

that, at the time of trial, she and Gaston were working on repairing their relationship. With regard to the events of the evening in question, R.C. testified that, after Gaston had agreed to have sex with her, they met each other at a gas station near 63rd and State Streets. R.C. was intoxicated before she arrived at the gas station and willingly entered Gaston's vehicle where they started drinking alcohol. When the two were about to have sex in the car, Gaston received a phone call from another woman. Gaston then indicated that he was ready to leave. R.C. became angry and stabbed him in the face and arm with a knife. The two then started fighting. After they exited the car Gaston punched R.C. in the face. They continued fighting until the police arrived at the gas station, at which time Gaston left the scene.

¶ 7     R.C. stated that, when the police approached her, she did not have her shirt on because she voluntarily took it off while she was in the car with Gaston. R.C. acknowledged that the bruises and injuries she sustained on her face and body were due to the altercation she had with Gaston. After the police left the scene, R.C. drove away in Gaston's vehicle and set it on fire.

¶ 8     R.C. acknowledged that she told the responding officer a different story about what happened on the night in question. R.C. told the responding officer that Gaston shoved her into the passenger seat of his vehicle, and was screaming that he was going to kill her. R.C. further indicated that she complied with Assistant State's Attorney (ASA) Holly Kremin's request to sign certain documents, but that she did not read the documents.

¶ 9     On cross-examination, R.C. testified that Gaston did not force her into his car and that she willingly removed her shirt. She acknowledged that on December 15, 2011, she submitted an affidavit to the State essentially recanting her prior written statement implicating Gaston. Defense counsel introduced the affidavit into evidence. In the affidavit, R.C. averred that the events that unfolded on the evening in question were the result of an argument between her and Gaston

that went too far. She averred that they were both drunk at the time of the incident, and that Gaston never attempted to sexually assault her on October 1, 2011, or on any other day they were together.

¶ 10   Officer Todd Partyka testified that, on the evening in question, he was on routine patrol with Officer Bochenek when, around 1 a.m., he received a call that a battery was in progress at a gas station. As Partyka approached the gas station in his squad car, he observed two individuals, one of whom was on the ground and the other, who was wearing a white shirt, standing above the individual on the ground and making a stomping motion. When Partyka exited his squad car, he saw the individual who was wearing the white shirt flee the scene. Partyka identified the individual as a male, and he and Bochenek pursued him, but did not catch him.

¶ 11   Officer Bochenek testified similarly to Officer Partyka. She also testified that she observed a woman, later identified as R.C., who was naked from the waist up, bent over on the ground, and an African American man holding her from behind. The man was beating her in the head. Both Bochenek and Partyka chased the man but failed to catch him. After the chase, Bochenek returned to the gas station and interviewed R.C. During the interview, R.C. stated that her ex-boyfriend, Gaston, caused her injuries. Bochenek did not smell alcohol on R.C. and she did not appear drunk.

¶ 12   ASA Kremin testified that on November 25, 2011, she and Detective Earls met with R.C. and took her written statement regarding the events of the evening in question. R.C.'s statement, which Kremin read aloud, was published at trial.

¶ 13   According to the statement, R.C. broke up with Gaston because he beat her with a crowbar in November of 2010. On the evening of September 30, 2011, R.C. agreed to meet Gaston at a gas station because he said he had clothes for their children. At the gas station, Gaston dragged

4

her by her hair into his vehicle. There, Gaston told R.C. that, because she must be having sex with her new boyfriend, she was going to have sex with him. Gaston then ripped R.C.'s shirt off and tried to unbutton her pants. R.C. stated that she believed Gaston was going to rape her, so she kicked him. When she did so, Gaston stumbled out of the car. R.C. attempted to escape, but Gaston grabbed her, punched her in the face and stomped on her head with his feet. Gaston also threatened to "put a bullet in her head." Gaston continued to beat R.C. until a gas station security guard approached them and told Gaston to stop. Gaston told the security guard that it was none of his business and continued to beat R.C. Several minutes later, the police arrived at the gas station and Gaston fled. When the police arrived, R.C. was naked from the waist up, and had bruises on her face, head, and body. R.C. indicated that she was not under the influence of drugs or alcohol.

¶ 14    Detective Timothy Earls testified similarly to ASA Kremin. He also testified that he spoke to R.C. before Kremin took her statement, and that R.C.'s statement to him regarding the incident was consistent with her subsequent written statement.

¶ 15    Thomas Rudolph testified for the defense that he was working at the gas station in question on the evening of September 30, 2011. Rudolph stated that he first became aware of the incident after the police arrived at the gas station. He denied that he saw a man and a woman outside of the station, and that he told the man to leave the woman alone. On cross-examination, Rudolph testified that he knew Gaston by his nickname "Fudge."

¶ 16    In finding Gaston guilty of attempted aggravated criminal sexual assault, the trial court stated:

"In a case like this you kind of think back, what ever [sic] happened to the good old days; bring the girl candy, flowers, have a glass of wine, go out for dinner someplace, that's

how I thought things used to be. Sex in a gas station, doesn't quite seem something that a person would want to do necessarily and someone trying to force someone to have sex is not necessarily totally a sexual encounter, it[']s sometimes to show the person, I want something, you've got it, I'll take it. It's a show of force basically. It's not like the candy and flowers and out for a glass of wine type of thing."

¶ 17    The court acknowledged that R.C. was a reluctant witness who wanted to forgive Gaston for his actions. In discussing the events as R.C. described them in her statement to the State's attorney, "before her so-called recantation," the trial court commented: "That hardly sounds to me like a romantic interlude, pulling off her blouse, pulling off her bra, trying to unbuckle her pants or whatever, pull her pants down or unbuckle them at least, and laying on top of her in a van in a gas station." The court found that R.C.'s affidavit and testimony "mean[t] nothing whatsoever," and was simply an attempt by R.C. to help Gaston and mend their troubled relationship. The court further found that the credible evidence it heard did not come from R.C., but rather from the witnesses, who arrived at the scene, saw the events unfold, and heard what R.C. said.

¶ 18    At sentencing, the State introduced certified copies of Gaston's two prior convictions, which rendered him subject to sentencing as a Class X offender. The trial court sentenced Gaston to 15 years' imprisonment and awarded Gaston 318 days of presentence custody credit.

¶ 19    On direct appeal, Gaston contended that the State failed to prove him guilty beyond a reasonable doubt of the aggravated criminal sexual assault of R.C. because the evidence presented came exclusively from R.C.'s prior statement, which she disavowed in an affidavit and at trial. Gaston also argued that R.C.'s original statement to the police was uncorroborated. In affirming Gaston's conviction, we declined to substitute our judgment for that of the trial court

on matters of credibility and found that "R.C.'s original statement, especially when combined with the testimony of the police officers, was sufficient to sustain Gaston's conviction for attempted aggravated criminal sexual assault." *People v. Gaston*, 2014 IL App (1st) 123387- U, ¶ 19.

¶ 20     On July 29, 2014, Gaston filed the instant *pro se* petition for postconviction relief, alleging that: he was denied his constitutional right to a fair trial because the trial court engaged in extrajudicial findings; he received ineffective assistance of appellate counsel based on counsel's failure to raise the issue of the trial court's extrajudicial findings on direct appeal; received ineffective assistance of trial counsel related to Gaston's decision not to testify and counsel's advice during plea negotiations; and he was actually innocent of the attempted aggravated criminal sexual assault based on R.C.'s affidavit.

¶ 21     To support his allegation of ineffective assistance of counsel during plea negotiations, Gaston attached an affidavit averring:

> "Also, prior to trial, my attorney advised me not to accept the 7-year plea offer because [R.C.] signed an affidavit, so there was no way the judge could convict me of attempted sexual assault.
>
> [Defense counsel] even led me to believe that if I were to accept the State's plea offer, I would have to serve 85 percent of my prison sentence. Had I known that I would only have to serve 50 percent of that 7-year sentence I would have been more vocal in regards to accepting the State's offer.
>
> Even though I wanted to consider accepting the plea my attorney advised me not to accept the State's plea offer because [R.C.] was the only person who could convict me. So my attorney protested against the plea.

That my attorney misled me to believe that I was facing 4-to-15 years in prison when in reality I was actually facing 6-to-30 years in prison. But, because I was not properly admonished by the judge and my attorney misled me regarding the maximum sentence range, I further rejected the State's offer of 7-years." (Internal paragraph numbering omitted.)

¶ 22   Gaston's postconviction petition was assigned to the judge who presided over his trial. Before the court ruled on his petition, Gaston filed a motion for substitution of judge. In the motion, Gaston argued that, because his postconviction petition alleged that the trial judge made extrajudicial findings during the pendency of his trial, the judge was an adverse party and could not render an impartial ruling on his postconviction petition. A different circuit court judge denied Gaston's motion for substitution after finding that Gaston did not show that the judge, who presided over his trial, was prejudiced against him.

¶ 23   On October 17, 2014, the circuit court issued a written order dismissing Gaston's *pro se* postconviction petition as frivolous and patently without merit. In the order, the court found that Gaston's claim regarding extrajudicial findings lacked merit because the "comments referred to by [Gaston] are comments by the court made after hearing all the evidence, as to the courts [sic] findings of fact and reasonable inferences based on the evidence." The court also noted that Gaston's allegation of judicial prejudice was set forth in his motion for substitution of judge, and that motion was denied. Because the court found that his claim relating to the extrajudicial findings lacked merit, the court concluded that his claim of ineffective assistance of appellate counsel, based on counsel's failure to raise this issue, was also meritless. The circuit court also found "no support in the record" for Gaston's claim that he received ineffective assistance of trial counsel during guilty plea negotiations. In reaching this conclusion, the court noted that

8

Gaston's "claims are belied by the record," where, according to the court, the only mention of a potential plea offer occurred on April 2, 2012, when the State indicated that the parties were "trying to see if [they] [could] work this out." Gaston appealed.

¶ 24   On appeal from the dismissal of his postconviction petition, Gaston argued that the trial court erred in dismissing his petition because he presented an arguable claim of ineffective assistance of counsel during plea negotiations, and because he presented an arguable claim of ineffective assistance of appellate counsel based on appellate counsel's failure to argue that he was denied a fair trial because the trial court engaged in extrajudicial findings. The State conceded that the trial court erred in summarily dismissing Gaston's postconviction petition because Gaston had presented an arguable claim of ineffective assistance of trial counsel during plea proceedings, but the State did not concede that appellate counsel was ineffective for failing to argue that the trial court engaged in extrajudicial findings. This Court agreed that Gaston presented an arguable claim of ineffective assistance of trial counsel during plea negotiations and remanded the case for second stage postconviction proceedings. *People v. Gaston*, 2017 IL App (1st) 143631-U. Because the State conceded that the case needed to be remanded on that issue, this Court did not address Gaston's claim of error regarding the ineffectiveness of his appellate counsel. We also granted Gaston's request that the matter be reassigned to a different judge on remand.

¶ 25   On November 21, 2017, the case was assigned to Judge Petrone. Gaston's postconviction counsel filed an appearance on behalf of Gaston on January 22, 2018. On January 29, 2018, postconviction counsel appeared before the trial court but the court did not have the file and the case was continued. On March 7, 2018, the trial court again did not have its file and the case was continued again. On March 14, 2018, the trial court found the file and told postconviction

counsel that it would make a copy of everything that was in the file for him by the next court date on March 21, 2018. The postconviction common law record does not contain a court sheet for March 21, 2018, and the postconviction record does not contain a transcript for that date either. A review of the Events and Orders of the Court section for case number 11CR2060101 on the Clerk of the Circuit Court of Cook County's website, https://cccportal.cookcountyclerkofcourt.org/CCCPortal (Clerk's Website), shows that on March 21, 2018, the case was continued to March 27, 2018.

¶26       On March 27, 2018, the trial court stated on the record that it had the file and continued the case until April 20, 2018. The case was called on April 13, 2018, and the trial court wrote on the court sheet, "missing file again", and the case was continued to May 3, 2018. Although the postconviction common law record does not contain a court sheet for April 20, 2018, or for May 3, 2018, and the postconviction record does not contain a transcript for those dates either, a review of the Clerk's Website shows that on April 20, 2018, the case was continued to May 3, 2018, and on May 3, 2018, the case was continued to May 21, 2018.

¶27       On May 21, 2018, postconviction counsel stated he had already filed his Rule 651(c) certification with the clerk's office, but because the court did not have its file, he tendered a copy of his 651(c) certification, dated May 15, 2018, to the court. The court then made a duplicate file so the case could advance. Postconviction counsel requested the date of June 20, 2018, but the trial court wrote June 15, 2018, on the court sheet. On June 15, 2018, the case was continued until July 20, 2018.

¶28       On July 2, 2018, the State filed a motion to dismiss Gaston's postconviction petition. Argument was heard on the motion on December 5, 2018. Before presenting his argument, postconviction counsel stated, "Judge, let me just briefly state that the in this case a very detailed

*pro se* petition was filed which we've adopted." The case was continued until January 16, 2019, when further arguments on the motion to dismiss were heard. The trial court ultimately dismissed the postconviction petition at the second stage, finding: 1) that Gaston's trial counsel was not ineffective, 2) that his appellate counsel was not ineffective for failing to raise the issue of ineffective assistance of trial counsel, 3) that Gaston's claim that the trial evidence was insufficient to prove him guilty beyond a reasonable doubt was *res judicata*, 4) that his claim that he is actually innocent based on newly discovered evidence of two witnesses fails because Gaston did not include affidavits from those witnesses, 5) that his claim that the trial court engaged in extrajudicial findings was forfeited because it could have been raised on appeal, and 6) that the affidavit from R.C. was not new evidence that showed he was actually innocent because R.C. had already recanted at trial and was cross examined.

¶ 29      Gaston appealed from the circuit court's denial of his postconviction petition at the second stage. He argued that he made a substantial showing that appellate counsel was ineffective for failing to argue that findings made by the trial court demonstrated judicial bias. He also argued that postconviction counsel failed to comply with Supreme Court Rule 651(c). We affirmed. *Gaston*, 2021 IL App (1st) 190566-U.

¶ 30      On September 27, 2023, the supreme court denied leave to appeal, but issued a supervisory order directing us to vacate our judgment and consider the effect of *People v. Addison*, 2023 IL 127119, on the issue of whether Gaston received reasonable assistance of postconviction counsel and determine if a different result is warranted. *People v. Gaston*, No. 128192 (Ill. Sept. 27, 2023). Accordingly, we vacated our judgment in *Gaston*, 2021 IL App (1st) 190566-U, in a separate order, granted Gaston's motion for supplemental briefing and now consider the effect of *Addison* on the facts of this case.

¶ 31                                    ANALYSIS

¶ 30    Gaston first argues that his postconviction petition should not have been dismissed at the second stage because he "made a substantial showing that appellate counsel was ineffective for failing to argue that findings made by the trial court demonstrated judicial bias." Specifically, Gaston claims that the trial court "interjected and considered its own opinions about romantic, sexual encounters during the finding of guilt, and specifically considered this improper evidence in  regard to [R.C.'s] testimony about her sexual encounter with Gaston".

¶ 31    The Act establishes a three-stage process for petitioners to "assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both." *People v. Hodges*, 234 Ill. 2d 1, 9-10 (2009). Gaston's petition was dismissed at the second stage of proceedings, in which counsel is appointed to represent the petitioner if necessary, and the State is permitted to file responsive pleadings. *People v. Edwards*, 197 Ill. 2d 239, 245-46 (2001). At the second stage of postconviction proceedings, "the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *Id*. at 246. "[A]ll well-pleaded facts that are not positively rebutted by the trial record are to be taken as true." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). The second stage of postconviction review tests the legal sufficiency of the petition. *People v. Domagala*, 2013 IL 113688, ¶ 35.

¶ 32    "The inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations," as such determinations are made during the evidentiary third stage of postconviction proceedings. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). "An evidentiary hearing is only required when the allegations of the petition, supported by the trial record and

accompanying affidavits, make a substantial showing of a violation of a constitutional right." *People v. Flowers*, 2015 IL App (1st) 113259, ¶ 31. In reviewing the second-stage dismissal of a postconviction petition, this court generally reviews *de novo* the circuit court's decision. *Pendleton*, 223 Ill. 2d at 473.

¶ 33    To prevail on a claim of ineffective assistance of appellate counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner must allege facts showing that failure to raise an issue on appeal was objectively unreasonable and that counsel's decision prejudiced him. *People v. Enis*, 194 Ill. 2d 361, 377 (2000).  Unless the underlying issue has merit, a petitioner cannot be considered to have suffered prejudice from appellate counsel's failure to raise that issue. *People v. Childress*, 191 Ill. 2d 168, 175 (2000).

¶ 34    The underlying issue here–that the trial court violated Gaston's due process rights by considering matters outside the record–has no merit and therefore Gaston suffered no prejudice. The trial court, as the trier of fact, is presumed to know the law and to have considered only competent evidence in determining the case on the merits. *People v. Koch*, 248 Ill. App. 3d 584, 589 (1993). To rebut this presumption, the record must affirmatively show that the trial court actually used the evidence improperly as alleged. *Id*.

¶ 35    "Due process does not permit [a trial judge] to go outside the record, except for matters of which a court may take judicial notice, or conduct a private investigation in a search for aids to help him make up his mind about the sufficiency of the evidence." *People v. Yarbrough*, 93 Ill. 2d 421, 429 (1982). However, "[a] trial judge does not operate in a bubble; [he] may take into account [his] own life and experience in ruling on the evidence." *People v. Thomas*, 377 Ill. App. 3d 950, 963 (2007). Reversal is only necessary when a trial court's reliance on matters outside the record is prejudicial to one of the parties. *People v. Banks*, 102 Ill. App. 3d 877, 882 (1981).

As such, "[r]eliance on information found [outside] the record is not reversible error where there is no evidence that it either misled or entered into the trial court's determination." *Id*. A trial court will be accorded every presumption it considered only admissible evidence in reaching a conclusion. *People v. Wallenberg*, 24 Ill. 2d 350 (1962). "This assumption will be overcome only if the record affirmatively demonstrates the contrary, as where it is established that the court's finding rests on a private investigation of the evidence, or on other private knowledge about the facts in the case." *People v. Tye*, 141 Ill. 2d 1, 26 (1990).

¶ 36     In announcing the verdict, the trial court commented:

"In a case like this you kind of think back, what ever [sic] happened to the good old days; bring the girl candy, flowers, have a glass of wine, go out for dinner someplace, that's how I thought things used to be. Sex in a van in a gas station, doesn't quite seem something that a person would want to do necessarily and someone trying to force someone to have sex is not necessarily totally a sexual encounter, it's sometimes to show the person, I want something, you've got it, I'll take it. It's a show of force basically. It's not like the candy and flowers and out for a glass of wine type thing.

And also, I point out, this is not a case [R.C.] versus Elbert Gaston, it's not a civil case where the victim comes in and says; ah, forget about it, I don't want to bother with this anymore. This is a criminal case, People versus Elbert Gaston. [R.C] is merely a witness in this case; albeit, a reluctant witness in this case.

Apparently she's trying to get a degree or whatever, working on a degree or something in criminal justice, that seems rather odd looking at the circumstances of this case. I always thought criminal justice meant if the State proves the  charges

14

beyond a reasonable doubt, the person is found guilty by a judge or jury, that's justice. The State charged the man, Judge, jury said, not convinced beyond a reasonable doubt, then Gaston is discharged, that's justice.

It doesn't seem like it's justice when someone who's a victim of a crime, has to be recorded on paper somewhere to establish they were a victim of a crime. That's basically one of the reasons you have 115-10.1, for a witness like [R.C.]. A recanting witness, who after a period of time goes by, she's willing to forgive and forget. Bad things happened to me on October 1, 2011, even a little before that, however time has gone by, I went to see him in the jail, communicated with each other, he's the father of three of my four children; ah, I'm willing to forgive and forget at this point.

However, it's not [R.C] versus Elbert Gaston, it's the charge brought by the State; the State proves the charges to, at least in part, to deter others from committing crimes like this. The fact that she's willing to forgive and forget, that's up to her, I'm not concerned with her forgiving and forgetting.

This was hardly a match made in heaven between Elbert Gaston and [R.C.]. They were together for a long time, from 1999, they had three children together, pretty much little ones, at least the last one or two were little ones. And things got a little rocky on occasion between Elbert Gaston and [R.C.].

And on various occasions she would take him back. She admits that on one occasion, although she says it was a lie, for some nonsensical reason it was a lie, that he hit her with a tire iron at some point, it's in the testimony, she admitted telling the police that, she said it didn't happen, but told the police that's what

15

occurred. And yet, after the incident, had (sic) they're back together and things go on and it comes to the evening we're talking about where there is a lot of calls and ultimately she agrees I'll meet you some place so he can drop off some stuff for three of the four kids, he had she had three kids with him.

The statement of the State's attorney, I don't want to meet him some place privately, I'll meet him in a public place, in a gas station. One would hardly expect in a public gas station at night some guy is going to do something bad to a person like [R.C.].

When they get there, she says basically she got up to the van, they're having a few beers, there is some other liquor of some sort or another and they start the touchy-feely stuff, according to her. And sort of to entice his interest, he takes off her blouse and her brassiere, and she's there in the van naked from the waist up trying to entice Elbert Gaston.

Her statement to the State's attorney in November of 2011 before her affidavit, before her so-called recantation then, is when they got to the -- she met him at the gas station, however she got there somehow or another, and at some point he says to her, I hear you got a boyfriend or something now, I know you're having sex with him, so therefore you're going to have sex with me. Elbert Gaston knows what he likes, he's a man that won't take no for an answer. You have another boyfriend now, you're having sex with him, well, have sex with me.

And then she has to get the man off of her somehow or another, otherwise there would have been a completed rape at that point in the car. It's rather bold in a public place in a gas station somebody could walk by, somebody could drive by,

somebody could walk around the car, somebody who worked in the gas station. But Elbert is a man who knows what he likes and what he likes is he wants to have sex with this woman, he had sex with her before, they have three children together.

And she kicks him and he basically sort of falls out or stumbles back out of the car and it's still not over with at that point. We have the effort by him to pull her by the hair and he knocks her down.

The testimony of the police officer who first gets there, they get there together but the one that testified first, the male officer, sees a man with a white T-shirt, he can't identify Gaston being that person, but he identifies a male with a white T-shirt who appears to be kicking at the person on the ground. And the person owing is [R.C.]. I don't think anybody identified her at that point, but circumstantially we know it's the same person.

At some point the police come back and she's there, by that time I think someone gave her something to put on other than standing there naked from the waist up in a public gas station at night. The photograph shows you can see she was clearly pummeled a number of times and stomped. The physical injuries shown to [R.C.] show or corroborate what she said in her statement as to what occurred between she and her former boyfriend, whatever you want to call him, former boyfriend children's [father], whatever you want to call Elbert to her.

And here the cases kind of always amazes you to some extent, I would almost be willing to bet, it's not that it's part of my findings at all, if he walked out of here today, he'd be in her house tonight. She'd take him back glowingly. As she said when she testified, we're trying to work things out, after all that.

17

Her affidavit means nothing whatsoever, it's an attempt by her to help out Elbert Gaston. And after all, he's the father of three of her children. At this point she wants to forgive and forget. Bad things happened that night but ah, it's all right, we'll work it out. Maybe they will work it out at some point or another.

Although, as I said before, it's not exactly a match made in heaven, but if she wants him back and he wants her back, they probably deserve each other.

The credible evidence is not necessarily the evidence I heard from [R.C.]. I heard from witnesses who came to the scene and saw what they saw and heard what [R.C.] said. That's why we have 115-10.1, for witnesses just like [R.C.] who are willing to forgive and forget and recant and say nothing happened.

It's sort of a sad commentary on the criminal justice system that you have to have victims put under oath or give statements to show they are actually victims, because actually after a while, they sort of lose interest, don't care anymore, willing to forgive and forget. But whether she wants to forgive and forget Elbert Gaston and what happened to her that late evening, early morning, that's between her and Elbert Gaston. When you do bad things, there are bad consequences.

I guess I should feel sad for calling [R.C.] a liar in some respects, but if that's how she takes it, that's how she takes it.

I find the Gaston guilty on Count No. 1, attempt aggravated criminal assault, Count 2 merges. I'm not going to worry about kidnapping and unlawful restraint. There's a finding of guilty on Count 1, Count 2 merges. And the unlawful restraint and the kidnapping are basically part of what caused or allowed the attempt sexual criminal assault to take place. Guilty on Count 1, Count 2 merges and

18

Count 3 and 4 are not guilty because they really make no difference to the case

whatsoever."

¶ 37    Gaston claims that these statements show the trial court improperly considered evidence

not in the record, and therefore the presumption that it considered only competent evidence was

rebutted. In support of his argument, Gaston cites *People v. Wallenberg*, 24 Ill. 2d 350 (1962).

There, a witness testified he travelled down a stretch of streets looking for a gas station to fix his

tire but did not find one.  In pronouncing its judgment, the trial court remarked that, although the

witness stated that he found no gas stations along that stretch of road, " 'I happen to know

different. I don't believe his story.' " *Id.* at 354. However, no evidence contradicting the

witness's testimony was in the record. *Id.* The *Wallenberg* court ruled that the trial court

improperly made a determination based upon its private knowledge instead of on the record

before it, and therefore the presumption that the trial court considered only admissible evidence

was rebutted. *Id.*

¶ 38    Unlike *Wallenberg,* the court here did not make determinations that contradicted the

undisputed testimony in the record. Rather, the trial court was merely discussing the evidence,

drawing inferences, and making credibility determinations based on its knowledge and

experience.  The trial court was permitted to draw on everyday life experience about romance in

determining whether the sexual encounter in the van at a gas station between R.C. and Gaston

was consensual, as R.C. testified to at trial, or whether R.C. was sexually assaulted and beaten by

Gaston as she told police investigating the incident.  The trier of fact is entitled to use their

knowledge and observations in life when considering the evidence presented. *Thomas*, 377 Ill.

App. 3d at 963.  Nothing that the trial judge said in explaining his decision was based on private

knowledge or evidence outside the record. We find that the trial court committed no error in

making these statements and, therefore, appellate counsel was not ineffective for failing to raise this issue.

¶ 39     Gaston next argues that postconviction counsel failed to comply with Supreme Court Rule 651(c) (Ill. S. Ct. R. 651(c) (eff. July 1, 2017), in that postconviction counsel failed to read the record and make an amendment to the petition that was necessary for an adequate presentation of his claim.  Specifically, Gaston argues that postconviction counsel was ineffective because he failed to shape his actual innocence claim into an ineffective assistance of trial counsel claim for failing to investigate and call two additional witnesses, Erica Palmer and Monterrie Jackson. According to Gaston, Palmer and Jackson provided affidavits stating that they knew R.C. and knew that R.C. lied about being sexually assaulted by Gaston.

¶ 40     There is no constitutional right to the assistance of counsel during postconviction proceedings. *People v. Custer*, 2019 IL 123339, ¶ 30. As a matter of legislative grace, however, the Act provides a right to a "reasonable level" of assistance. *Id*. A "reasonable level *** is significantly lower than the one mandated at trial by our state and federal constitutions." (Internal quotation marks omitted.) *Id*. To guarantee a reasonable level of assistance, postconviction counsel must comply with Rule 651(c), which requires counsel to (1) consult with the petitioner to ascertain his contentions; (2) examine the record of the trial proceedings; and (3) make amendments to the *pro se* petition necessary for an adequate presentation of the petitioner's contentions. *Id*.; see also Ill. S. Ct. R. 651(c) (eff. July 1, 2017). Compliance with Rule 651(c) is mandatory, but substantial compliance is sufficient.  *Addison*, 2023 IL 127119, ¶21.

¶ 41     When postconviction counsel files a certificate attesting that they have performed the duties required by Rule 651(c), the certificate creates a rebuttable presumption that counsel

provided the reasonable level of assistance the Act guarantees. *Id.* ¶ 21. The petitioner then bears the burden of overcoming that presumption by demonstrating counsel failed to substantially comply with the rule. *Id.* One of the ways a defendant may meet this burden is by "demonstrating that postconviction counsel did not make all necessary amendments to the *pro se* petition." *Id*. We review *de novo* whether counsel substantially complied with Rule 651(c). *Id.*

¶ 42    Here, postconviction counsel filed a 651(c) certificate that stated the following:

> "The undersigned, on oath, as the attorney in this matter and pursuant to Illinois Supreme Court Rule 651(c) has consulted with petitioner by phone, mail, electronic means or in person to ascertain his contentions of deprivation of constitutional rights, has examined the record of the proceedings at the trial and sentencing and reviewed the original court file. Counsel has conducted a diligent investigation into this matter and he verily believes the facts and circumstances support the filing of this Petition and the statements in said Petition are true in substance and in fact."

¶ 43    Generally, when postconviction counsel fails to file a Rule 651(c) certificate or fails to file a certificate that includes all three of the required representation, it is sufficient that counsel made a clear and affirmative showing of compliance on the record. *People v. Woods*, 2020 IL App (1st) 162751, ¶ 99 (quoting *People v Smith*, 2016 IL App (4th) 140085, ¶33) (Counsel's oral representation to the court in conjunction with filing a Rule 651(c) certificate is sufficient to establish that counsel complied with the requirements of the rule). Here, counsel filed a Rule 651(c) certificate and orally informed the court on the record that he was adopting Gaston's "very detailed" *pro se* petition. Specifically, at the December 5, 2018, hearing, postconviction counsel stated, "Judge, let me just briefly state that the petitioner in this case filed a very detailed *pro se* petition which we've adopted." Thereafter, on January 16, 2019, postconviction counsel

stated, "the Court's determination to docket this matter and advance it to the second stage was based on a review of the petition that was filed *pro se* by Mr. Gaston which I adopted wholly once I filed my appearance." However, postconviction counsel did not specifically state in the Rule 651(c) certificate, or orally, that he "made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of Gaston's contentions."

¶ 44    Gaston challenges postconviction counsel's compliance with the second two obligations imposed by Rule 651(c), arguing that counsel failed to read the record and failed to make the necessary amendments to his petition to adequately present his claims. Gaston argues that at the hearing on the motion to dismiss, postconviction counsel argued that trial counsel did not know about the complaining witness' recantation, when in fact the recantation was the central issue at trial.  Gaston claims that this shows that counsel did not read the record. Gaston also argues that postconviction counsel failed to amend his *pro se* petition to adequately present his claims.  We address each claim in turn.

¶ 45    As stated, postconviction counsel averred that he "examined the record of the proceedings at the trial and sentencing and reviewed the original court file."  However, Gaston specifically points to a comment postconviction counsel made during a hearing on the State's motion to dismiss the postconviction petition: "While she was of course known to the petitioner and his attorney at the time of the trial, her recantation was not." Gaston argues that because R.C. had recanted in an affidavit prior to testifying, and also recanted during her in-court testimony, postconviction counsel must not have reviewed the record.

¶ 46    Gaston takes postconviction counsel's statement out of context.  Counsel's entire argument to the court was:

        "I think the only two matters with which I believe it's important to make a record of and

draw your Honor's attention to are that there is in fact an assertion of actual innocence in this case. Supported by the attached affidavit of the original complaining witness and alleged victim in this case. While she was of course known to the petitioner and his attorney at the time of the trial, her recantation was not."

¶ 47    The recantation that counsel is referring to in his statement above is R.C.'s June 16, 2014, very detailed and specific, 12-paragraph affidavit, that Gaston attached to his postconviction petition in support of his actual innocence claim. In this affidavit, R.C. provided a detailed, written account of what happened on the evening in question and indicated that she lied to the police when she gave a statement on October 1, 2011, and again lied when she signed and verified her statement at the police station on November 26, 2011. This affidavit contains more information and is more detailed than both her initial recantation affidavit dated December 15, 2011, and her trial testimony. The mention of R.C.'s recantation in this context in no way demonstrates that postconviction counsel failed to read the record. Counsel was merely explaining to the court that this *most recent version* of R.C.'s recantation by affidavit was not known to Gaston or his attorney at the time of trial. Accordingly, we reject Gaston's contention that postconviction counsel failed to read the record.

¶ 48    Before we address the merits of Gaston's claim regarding postconviction counsel's failure to comply with Rule 651(c) by failing to amend the *pro se* petition to include an ineffective assistance of counsel claim, we find it necessary to address a threshold issue that is relevant to our consideration of this claim. In our review of the record filed in this court, we have noticed that there are *two* copies of Gaston's *pro se* postconviction petition. One contains the affidavits of Palmer and Jackson. The other does not.

¶ 49    When the State filed its motion to dismiss Gaston's postconviction petition, which had

23

been adopted by postconviction counsel, at the second stage, the State argued that Gaston had failed to attach the Palmer and Jackson affidavits to his petition and therefore failed to demonstrate that the witnesses existed or that the witnesses would have provided testimony favorable to him.  At the hearing on the State's motion to dismiss, the State again argued that Gaston did not attach the affidavits from Palmer and Jackson.  Although postconviction counsel surely knew that the absence of these affidavits was fatal to Gaston's claim, postconviction counsel did not directly address this issue in response, nor did postconviction counsel amend the petition. See *People v. Collins*, 202 Ill. 2d 59, 66 (2002) (a defendant's failure to attach affidavits or documentation required by section 122-2 of the Act, or otherwise explain their absence, is fatal to his postconviction petition).

¶ 50      The circuit court then dismissed Gaston's postconviction petition at the second stage in a written order on February 5, 2019.  Regarding Gaston's claim of actual innocence based on the affidavits of Palmer and Jackson, the circuit court stated that Gaston's claim failed because he failed to attach their affidavits to his petition and did not explain the absence of the affidavits or what efforts were made to secure them. The circuit court therefore found Gaston's claim did not meet the requirement for actual innocence. To establish a colorable claim of actual innocence, the evidence in support of the claim must be newly discovered, material and not merely cumulative, and of such a conclusive character that it will probably change the result of retrial. *People v. Edwards*, 2012 IL 111711, ¶ 32. Claims of actual innocence "must be supported 'with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.' " *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)).

¶ 51      We note that after we remanded this case to the circuit court for second stage

24

postconviction proceedings *(People v. Gaston*, 2017 IL App (1st) 143631-U), the original court file could not be located and the case had to be continued several times. It appears that the court file was lost, then found, and then lost again. At one point a new court file was constructed. The record is unclear if the original court file was ever located. While we cannot explain why the Palmer and Jackon affidavits appear in the record on appeal when they were clearly not before the circuit court, our best guess is that those affidavits were lost, misplaced or overlooked when the court file went missing and when copies were given to postconviction counsel. We cannot be certain that those affidavits were part of the original petition, but will give Gaston the benefit of the doubt, particularly because he references Palmer's and Jackson's affidavits numerous times in his *pro se* postconviction petition and discusses at length how their testimony would alter the outcome of his case.

¶ 52    In his *pro se* postconviction petition, Gaston alleged that Palmer's "affidavit completely exonerates him" and that Jackson's affidavit established that R.C. "fabricated" the sexual assault allegations against Gaston and fully exposed R.C.'s intent to frame him. Gaston alleged that Palmer's and Jackson's affidavits were "newly discovered evidence" and could not have been discovered sooner through due diligence. Gaston claimed that Palmer and Jackson were "unavailable at trial because they were, at that time, unknown to counsel." Gaston also claimed that "[e]ven with due diligence, trial counsel could not have obtained these affidavits because there is no indication that they were willing to testify during Gaston's trial." Given that the circuit court dismissed Gaston's actual innocence claim on the mistaken belief that Palmer's and Jackson's affidavits were unavailable, we remand to the circuit court for the court to consider whether Gaston made a substantial showing of a constitutional violation with respect to his actual innocence claim based on Palmer's and Jackson's affidavits.

¶ 53    In addition, given that postconviction counsel failed to affirmatively state in his Rule 651(c) certificate that he amended Gaston's *pro se* petition to adequately present Gaston's claims and we have found no clear and affirmative showing of compliance on this record, we find that based on the unique facts of this case, we are required by *People v. Addison*, 2023 IL 127119, ¶ 44 ("[p]ostconviction counsel did not comply with Rule 651(c)" and that, accordingly, the defendant had "rebutted the presumption of reasonable assistance that arose from postconviction counsel's Rule 651(c) certificate") to reverse and remand for further second stage proceedings. On remand, Gaston is entitled to new counsel who, after complying with the responsibilities in Rule 651(c), shall file the required certificate and, thereafter, file an amended petition. *People v. Burns*, 2019 IL App (4th) 170018, ¶ 3.

¶ 54                                        CONCLUSION

¶ 55    For the reasons stated, the judgment of the circuit court is reversed and remanded for further proceedings consistent with this order.

¶ 56    Reversed and remanded.